All right, let's start again. Case number 20-1289, the Chemours Company FC v. Daikin Industries, Ltd. Ms. Fiorella, proceed. Good morning, Your Honors. May it please the Court, Nitika Fiorella on behalf of the appellate Chemours. This Court should reverse the Board's obvious decision based on a single reference for three reasons. First, it fundamentally erred when it began its analysis with the flawed premise that was advanced by Daikin, that a generalized desire to coat wires faster is enough to show that a skilled artisan would have found it obvious to modify Kalbeck's particular polymer, a narrow molecular weight distribution polymer, in order to achieve those faster speeds. Second, the Board erred when, because it had no evidence from Daikin on the relevant question, it advanced its own rationale for why a skilled artisan would modify Kalbeck's polymer to increase its melt flow rate, even though doing so would broaden its distribution. The reason why that was error, aside from the simple APA violation, was because the Board simply had no evidence to support that finding, and it didn't give Chemours the opportunity or notice to respond fully to that finding. And third, the Board erred by misapplying the law on nexus and the requirements for commercial success, and ultimately discounting Chemours' significant objective indicia evidence, which would have protected the Board from using hindsight to find the claims obvious in the first place. I'll start with the first error. Now, the Board erred by divorcing the motivation analysis from the actual prior art reference that issue, and relying just on a generic motivation to go faster. But here, it is key that it was Daikin... It's more than a generic motivation to go faster. It's also talking about that notion that broader molecular weights can be beneficial, right? Yes, Your Honor, there is. And that they also found that the narrower molecular weights of Kalbeck was just a preference rather than something that was necessary to the invention. Well, Your Honor, I would disagree on that second point. But to start with your first point, the argument advanced by Daikin was simply that Kalbeck wants to go faster, or a skilled artisan would look at Kalbeck and say, I can go even faster, which means that I will get higher speeds, which means that I can coat wires at a higher rate and increase productivity. So, why not increase that melt flow rate? Daikin did not present any evidence on molecular weight distribution or why broad or narrow would have any impact on that. That is simply missing from Daikin's analysis. The board did review some of Comoros' evidence on this point, which is the only evidence in the record. But I would disagree that the board found that Kalbeck's desire for a polymer with a narrow molecular weight distribution is simply a preference. Where in Kalbeck does it say it's anything more than a preference? Your Honor, I would point you to multiple places in Kalbeck. First, on Appendix 347, Column 3, Lines 34 through 37, Kalbeck says, the polymer of the invention used to coat wire in cable conductors has a very narrow molecular weight distribution. And then it continues- Right, but in that same column, when they get down to line 58 or 54 or something like that, it's been discovered that a narrow molecular weight distribution performs better. It doesn't say that it's essential. Your Honor, I would point to that same section and suggest that, especially given the conventional wisdom at the time that you needed broad molecular weight distribution polymers in order to achieve these higher processing speeds. What Kalbeck is saying here is, actually, you don't. My invention is that you can get those higher speeds with that narrow distribution. And that is supported by other parts in the specification where Kalbeck- I'm not seeing how this is a teaching. Which is your contention, right? I'm sorry, Judge Jake, you cut out just a little bit. Could you repeat your question? Sorry. Your contention is that this is a teaching away from using a broad molecular weight distribution. But I'm having difficulty seeing how this is a teaching away when it just says that it's better to use a narrow distribution. Certainly, Your Honor. Well, so that one paragraph frames the invention. So, it starts- Kalbeck starts by saying, look, what I invented was a narrow molecular weight distribution- But does it teach away from a broad molecular weight distribution? I would say that that passage, in conjunction with others, for example, column four on the same page, lines 47 through 51, where Kalbeck is actually now talking about how do you make this polymer, which is a complicated thing. It's not as simple as just mixing a few things together. And when Kalbeck is saying, how do you make my polymer, the one that I say performs so much better, first, don't use chain transfer agents. And why? It says right here, appendix 347, column four, line 59, because chain transfer agents intrinsically broaden the molecular weight distribution. So, again, showing that when it actually gets into how to make it, it says, don't use that method. We see the same thing on appendix 348 at column five, lines 22 to 26, where Kalbeck says, also, be careful with those higher fluorination temperatures, because they can result in a difficult, difficultly controllable change to that MSI value. And that can result in broadening the molecular weight distribution and negatively affect performance. So, again, what Kalbeck is saying is not just, hey, if you can make it narrow, it's saying, these are ways that we're known to make it broad. Don't do them here, because my discovery is you don't need broad. You can do this all with narrow. So, Your Honor, I would respectfully suggest that Kalbeck's invention is the narrow molecular distribution polymer, not just a preference. And I'll also note that Deiken never made this argument. The board somewhat suggested it by essentially just discounting Kalbeck's teachings altogether. Reading the opinion, it sounds as if the board didn't really think Kalbeck invented much of anything, but that wasn't proper for the board to do. But more importantly, the board cited no evidence from Deiken on this point, because Deiken never made this argument. So, just on that basis... Does the board ever cite any reasons or state any background as to the negative effect performance that would occur by broadening the molecular weight distribution? What's the negative aspect? Go ahead. No, Your Honor. The board does not say something would be negative with broadening the molecular weight distribution of Kalbeck. What the board simply says is, even though one is looking at Kalbeck, which is the single obvious misreference, and even though Deiken's argument is that you would just increase that melt flow rate, somebody would still be willing to do that, even though Kalbeck itself teaches that narrow molecular weight distributions are better. It does not cite any particular evidence, however, suggesting that broadening the distribution is worse. It just doesn't really engage on the issue, because it finds that Kalbeck's descriptions of narrow molecular weight distributions... Yeah, I was asking more about what Kalbeck discloses. Does Kalbeck tell us what the negative effect is by broadening the molecular weight distribution? What Kalbeck tells us is that broadening the molecular weight distribution has... It was consistently known to be the way to increase melt flow rates, because you were able to combine multiple different molecular weights. It goes through some processes for how you would do that, but it doesn't say that there is one particular bad thing with broadening molecular weight distributions. What it says is that narrow is actually better. What Kalbeck's invention is, and what Kalbeck teaches, is don't do all these methods that were previously known for broad, because what I found is you can get great results just by using a narrow molecular weight distribution. And, Your Honors, again, I would just point to the fact that we're having this discussion, because the board took it upon itself to review and try to figure out what a skilled artisan would think that Kalbeck teaches, when Daikin never presented any evidence on this point. So, we didn't have the notice and opportunity to respond. Now, had Daikin made the argument that Kalbeck was not teaching that you should go with a narrow molecular weight distribution, or that there's so many other reasons why a skilled artisan reading Kalbeck would say, no, let me just broaden that distribution anyway, we would have come in with significant more support, highlighting all the reasons why reading Kalbeck, a skilled artisan, wouldn't think, yes, let me broaden the distribution. Maybe it won't work as well. So, one of the things that Kalbeck does teach is that even Kalbeck doesn't know why it got such good performance with its polymer. So, a skilled artisan reading that. Well, but you're not saying that there isn't evidence in the record in Kalbeck and in other places that many people believe that broadening was beneficial, right? No, Your Honor, I agree that many people believed broadening was beneficial, and Kalbeck itself discusses those people and why they thought that was the case and debunks that theory. So, Kalbeck's invention is that all those other people were wrong. You don't need that broad distribution in order to get these high processing speeds at a superior quality. So, that's why it's so key to Kalbeck, which, again, is the reference that Daikin chose to rely on. So, it needed to use Kalbeck's polymer as the starting point. That's where we are. We're talking about whether Kalbeck is-whether modifying Kalbeck would be obvious to achieve the claimed invention, not just any polymer out there. So, on that point, we have to look at what Kalbeck tells you to do and what Kalbeck tells you not to do. Daikin did not engage- I was going to say that just because something says that one approach is better is not a teaching away, right? Again, Your Honor, what I would say is that taking Kalbeck holistically as we have to, reading the reference as a whole, what Kalbeck tells you is that- No, but answer my question. I mean, we have said, have we not, that just because something teaches that one approach is better is not a teaching away. Yes, Your Honor. I think, though, what is happening in Kalbeck is that it's establishing much more than just a preference of something is better. It is saying, with my polymer, do this. And so, this might be a different case if we were talking about a motivation to combine multiple different references that showed you can still get all the great benefits that Kalbeck got by just doing something a little bit differently. And so, a skilled artist would look at all this information. I believe that I'm into my rebuttal time if I could just finish this answer. Yes, please do. Thank you. So, what-it would be a different situation if we were talking about combining multiple references. We're not here. We're talking about one single reference, which means that it is the starting point, and Dykin needed to show there was a motivation. Somebody looking at this would think, yeah, it does make sense for me to increase melt flow rate, even though Kalbeck says it already goes pretty fast. It already creates great polymer. I don't even know why it does, but this is great. And then beyond that, to say, and I'm going to do so, even though all known methods would increase, excuse me, broaden molecular weight distribution, which Kalbeck consistently says, that's not what my invention's about. So, it's a more holistic approach than simply a straight teaching away argument. It's looking at the reference as a whole and seeing what does it teach and why would a skilled artist do anything with it? And that's where Dykin did not present the requisite proof. If there are no further questions, I'll save my remaining time for rebuttal. Anything else for Ms. Fiorella at this point? Okay. Thank you. We'll hear from Mr. Custodius. Thank you, Judge Newman. Good morning, Your Honors, and may it please the court. Substantial evidence and proper legal rulings support the board's decision in this case. It should be affirmed. And I'd like to start with the colloquy that Judge Dykin had with my friend during the opening argument, particularly having to do with teaching away. Because I think that an explanation of what Kimura's teaching away argument is really unpacks the problem with their appeal. In the first place, what a prior art reference teaches is a question of fact. My friend seems to think that this court can construe this patent as though it is a patent being constructed, and that's just not so. The board made particular findings based on substantial evidence, and they haven't been shown to be clearly erroneous. Now, what my friend tries to do, and I think she said this in almost these words during her argument, is to say that Dykin didn't argue that Kalbach doesn't teach away, as though somehow or another, it was our burden to prove the absence of a teaching away on this record. And of course, that's not the case, and that's not how the board understood it. Why is this really? I appreciate that we've been focused on teaching away, but isn't the question really whether the prior art suggests and motivates the particular molecular weight mix that they finally came up with? Well, that is the initial question, Judge Newman, and I would say that on that issue- Isn't that the only question? And whether, in fact, as they argue, that once we know that there is a better method, an improved result with the molecular weight, with the polymer structure that they have, we then reconstruct and find that in the prior art, but that the prior art does not suggest that this is the way to go. Isn't that their best argument, and in fact a difficult one to respond to? Well, I guess I might agree that it's their best argument. I wouldn't agree that it's a difficult one to respond to. Well, that was my question for you. Okay. And I'm going to answer that and show you that it's not that particularly difficult to resolve here. If the only prior art at issue and the only thing that we are taking into the person of ordinary skills, that hypothetical person's knowledge, was callback, we still have, and the flow rate range, starting at 15 grams per 10 minutes with a practical maximum value that is well above the 30 that is disclosed in the Chemours patents here. That's one finding of the board. It hasn't been challenged with any meaningful substantial evidence coming from the other side, but the board also made an alternate finding, and that is that a person of ordinary skill would be armed with, and that includes the prior references like Kono, which is cited at A44, like Thule, also cited at that page, which show melt flow rates of up to 50 grams per 10 minutes, with Kono saying 30 to 45 grams per 10 minutes were preferred, with part of that knowledge of the person of ordinary skill. So they knew, this hypothetical person of ordinary skill knew, and the board found that you could go, even if the only disclosure in callback was that 24 grams per 10 minutes melt flow range, you could go slightly upward to the 27, which is the low end of the plus or minus 30 range that's disclosed, that's claimed rather, in the Chemours patents. That very modest uptick was well within the zone of what the person of ordinary skill would have understood, and that's true even if you take into account the teaching away argument, an argument, by the way, that Chemours itself disclaimed before the patent office in its patent donors reply brief at page A2836. But let's say that teaching away is still on the table. What does callback tell us about this molecular weight distribution range? It tells us at column three that the polymer has a very narrow molecular weight distribution, and then it says, i.e., a ratio of Mw to Mn of less than about 2. So if we take that as a definition, which we don't have to, the board certainly didn't, but let's give them the best case that they possibly could have and take that as a definition. A molecular weight distribution ratio of less than about 2, what's the molecular weight distribution of their preferred embodiment with the MFI value of 24? Well, what you know is that that's only got a 1.6 molecular weight distribution. So that person of ordinary skill, even if all he's got in front of him is callback, knows that he could nudge up that 24 melt flow rate to 27, 28, 29, 30 without having an appreciable effect on molecular weight that was referenced earlier. Column five, lines 25 to 27, where it says that this can result in a broadening of molecular weight distribution and negatively affect performance. Why is that not teaching away? Judge Rayner, as my friend said, and quite correctly, the board was obligated to take callback as a whole. And as Judge Dyke properly pointed out, the callback as a whole suggests that this aspect of the specification is described as something that performs better. And even if there is something that generally might nudge someone... It doesn't couch the language in terms of performance. It simply says that broadening molecular weight distribution will negatively affect performance. And that seems to say that any type of action you take that's going to broaden molecular weight distribution, you shouldn't do that because it negatively affects the performance. Is that not teaching away? No, it's not teaching away at all. Even if that was all that there was in the document, that wouldn't be a teaching away. The teaching away has to be something along the lines of a stop sign, something that says that discourages a particular path or would lead the person of ordinary skill in a divergent direction. I just wanted to interject that however you characterize it, the opposite. It's hard to find an affirmative motivation and suggestion to go in that direction. And isn't that the standard? Oh, but callback isn't the only thing that the person of ordinary skill knew about. The standard and the motivation does not just have to come from callback. In fact, the board was entitled to and did consider callback from the perspective of person of ordinary skill. And in light of the prior art, which showed that not only was there much teaching of higher melt flow rates having excellent outcomes without faults and with stabilized FEP composition than in callback, that entirety of the prior art... Yes, Judge Rainey. What about the language in column 3, lines 60 through 65, where it discusses that a narrow molecular weight distribution, that it has not been discovered that a narrow molecular weight distribution performs better, thus overcoming a well-established prejudice. So it's suggesting that a POSA would come possessed with this well-established prejudice and that there's nothing... It had not been discovered that a narrow molecular weight performs better. That in addition to the negative effect statement. So I guess I want to make sure I'm answering your question, Judge Rainey. I think you're asking me if this language at the bottom of column 3 in the despite a narrow molecular weight distribution language reflects the teaching away. Again, I point out that it was not our burden to negative this in the first instance. There was plenty of indication in the art to make out our prima facie case. The opening argument didn't seriously contest that other than to suggest that callback itself doesn't provide the motivation. And quite frankly, one of the other aspects of this that I haven't underscored yet, but it's very important, is that the molecular weight distribution aspect of the argument, aside from having been disclaimed in the patent office, and aside from not being nearly as clear as Chemours would hope, is not even an element or a limitation of the Chemours patent claims in this suit. All of these are questions of facts. The burdens were properly allocated. The law was properly applied. There is some evidence that supports Chemours case, but there was other evidence that was against it. The board, quite properly, resolved those issues in resolving this case on proper, evidentially supported findings of fact. Mr. Castanhas, before you sit down, would you please address the considerations, the objective indicia, because it strikes me that the board's approach to that was somewhat problematic, and that we may need a remand to have them consider objective indicia against the prima facie case that you argue exists here. I don't really see here why a remand should be necessary, because the board, in fact, did consider those secondary considerations. It started with the required nexus inquiry. But, I mean, some of that is not correct, right? You can't treat the patent ensued as a blocking patent. That's not correct. Well, and let me explain what the board's observations on that reflect. The board discussed blocking patents at page 57 of the appendix, and it has to be understood in the vein that the board was talking about entirely here, and that is that this was a burden which Chemours had, which it failed to satisfy with regard to nexus, and then assuming that. Do you agree that the patent ensued can't be a blocking patent? I would agree, generally speaking, the patent ensued can't be a blocking patent. But what I would also say is that you should understand the board's comment, because we didn't make this argument. The board's comment was not about the blocking patent in and of itself being a show stopper with regard to secondary considerations, but it was really a commentary on the lack of meaningful context that was provided by Chemours putting in nothing more than their bare gross sales numbers as the proof of nexus and commercial success. And the board was right, as simply as a factual matter, to point out that Chemours patents, whether they're categorized as blocking patents or not, might well have deterred competition once they were issued in 2006, and might have been, and this is just speculation on the board's part, because Chemours didn't offer much more than an extraordinarily weak case, as the board pointed out on repeated occasions of secondary considerations yesterday. Yeah, would you also agree that we don't require that market-shared data is required to show commercial success? Would you agree with that? And I think what the board did is they did rely, in part anyway, the nexus argument on market share, and said that there was no market-shared data that was submitted, and that for that reason, they were not able to show commercial success. But they did provide sales data. That's right. They did provide sales data, but nothing more. And the board gave that the weight that it deserved, which was some, but not much. I think the board said you did not provide market-shared data, and therefore, you don't show commercial success. The board says at page 57 of the appendix, patent owner presents gross sales figures for FEP 9494, but such gross sales figures, particularly in the absence of a defined market, are inadequate to establish commercial success, citing its own opinion in Ex Parte Gela, which in turn cited this court's decision in Cable Electric, which holds that what mere gross sales figures show in relation to commercial success is fairly minimal. And that's exactly what the board did here. It didn't say that there was going to be no weight given to it. In fact, quite the contrary. When you look at what the board said in the end, it fully considered, and this is at page 858, the fully developed record evidence, but was not persuaded. It didn't categorically exclude this evidence. It simply said that this out of my time, I predicted that pretty well. In the end, your honors, the board in this case reached the correct decision on correct law and the factual findings that were supported by the administrative record, which it considered entirely. Its final written decision should be affirmed. Once the court has further questions, we'll submit on the arguments and briefs. Any more questions for Mr. Kostanius? No, I hear none. All right. Ms. Piarella, you have your rebuttal time. Thank you, your honor. I'd like to start with the objective indicia. As members of this panel have already espoused, the board made a number of errors here, and I believe that we briefed them, so I won't go through them in detail. One, although my friend on the other side tries to suggest that the board didn't actually find that the challenge patents were blocking patents and calls it commentary, that simply is not what the board did. It cited blocking patent law. It used the term blocking patents, and it specifically said that the challenge patents blocked innovation. That was legally wrong and cannot and is not the law, and so for that reason alone, the board erred. With respect to the market share data, again, my friend on the other side suggests that the board was simply saying market share data would have been nice. That's not what the board said. The board said that gross sale data was insufficient to show commercial success because there wasn't market share data. That's not what this court has held, as we've discussed in our briefs. And then on the broader nexus point, which, again, we have in our briefs, but I'm happy to answer questions. The board doesn't, in the middle of 57, go on to say that proper commercial success analysis requires, according to the appropriate weight, to have such evidence, and then it characterizes it as weak evidence. I'm not sure that's dismissal, is it? I'm sorry. I'm sorry. You cut out again, Judge Day. Could you repeat that last one? The board's statements in the middle of 57 don't seem to dismiss the evidence entirely, but rather to characterize it as weak evidence. Your Honor, I would say that when you're reading the previous paragraph where the board actually talks about what weight it gave the gross sales data, it shows that it gave it none, and simply in the next paragraph says all this other evidence that we presented, which we presented significant evidence on commercial success, ultimately it found it weak because it said I can't figure anything out with it without market share data. So it all flows together, and I see that I'm out of time. If I could just finish the answer to this question. Please answer the question. We'll see if the panel has any more questions. Thank you. So I apologize, Judge Dyke, but what I was saying is that the board already had said that it wasn't going to consider gross sales data because it didn't have market share data, and then simply just saying that the evidence is weak doesn't suggest that it actually considered that data under the proper legal standard. So I would say that it's still an error of the board to have essentially said that they didn't need to consider it at all. If there are any further questions, I'm happy to address. Otherwise, we would submit the case by saying that we believe that the board's decision should be reversed. Okay. Any more questions for Ms. Fiorella? I hear none. All right. Well, thanks to counsel. The case is taken under submission.